ANR PIPELINE COMPANY, and Colorado Interstate Gas Company, Petitioners,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent.

Michigan Consolidated Gas Company, Exxon Corporation, Tennessee Gas Pipeline Company, Brumark Corporation, Pacific Gas and Electric Company, Intervenors.

No. 91–1386.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 16, 1993.

Decided March 26, 1993.

Daniel F. Collins, with whom G. Mark Cook, Richard W. Miller and Christine R. Pembroke, were on the brief, for petitioners.

Randolph Lee Elliott, Atty., F.E.R.C., with whom William S. Scherman, Gen. Counsel, Jerome M. Feit, Sol., Joseph S. Davies, Deputy Sol., and Joel M. Cockrell, Atty., F.E.R.C., were on the brief, for respondent.

Jeffrey M. Petrash, entered an appearance for intervenor Michigan Consol. Gas Co.

Stephen L. Teichler, C. Roger Hoffman and Douglas W. Rasch, entered appearances for intervenor Exxon Corp.

Robert G. Kern and Robert H. Benna, entered appearances for intervenor Tennessee Gas Pipeline Co.

Mark R. Haskell, entered an appearance for intervenor Brumark Corp.

David W. Anderson, entered an appearance for intervenor Pacific Gas and Elec. Co.

Before: MIKVA, Chief Judge, WILLIAMS and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

ANR Pipeline Co. and Colorado Interstate Gas Co., here referred to collectively as ANR, petition for review of the Federal Energy Regulatory Commission's Orders No. 500–K and 500–L, FERC Stats. & Regs. ¶ 30,917 (1991) and 55 FERC ¶ 61,489 (1991), objecting that those orders arbitrarily and capriciously ended petitioners' ability to "apply" previously earned "take-or-pay credits". The Commission says that in fact it resolved that issue no later than its Order No. 500–I, FERC Stats. & Regs. ¶ 30,880 (1990); as ANR failed to file a timely petition for rehearing of that order (let alone a timely appeal), FERC says our jurisdiction is barred by Sections 19(a) and (b) of the Natural Gas Act, 15 U.S.C. §§ 717r(a), (b). We do not find Order No. 500–I to be a model of clarity by a long shot; however, because we believe that an ordinary reader familiar with the industry background would have recognized a very substantial likelihood that the order meant what the Commission ultimately said it meant, we agree with the Commission that we have no jurisdiction over ANR's challenge.

\* \* \*

The background is well known in the industry. In 1985 FERC issued its Order No. 436, which established powerful incentives for pipelines to transport gas sold by producers in direct competition with gas sold by the pipelines themselves. Because Order No. 436 enabled producers to undercut the pipelines' own gas sales, it tended to increase the pipelines' liability under take-or-pay clauses, which require them to pay producers even for volumes of gas

they do not take. In *Associated Gas Distributors v. FERC*, 824 F.2d 981 (D.C.Cir. 1987), this court vacated Order No. 436 and ordered FERC in any repromulgation of open access to address its effect on pipelines' take-or-pay liability. *Id.* at 1021–30, 1044.

FERC responded with a succession of orders establishing a crediting system to mitigate the effects of open access. The orders in essence required producers that used the Commission's open-access rules to agree to credit the volumes to be transported against the transporting pipeline's take-or-pay liability. Order No. 500–H, FERC Stats. & Regs. ¶ 30,867 (1989), which made final the open access regulations that the Commission had previously issued on an interim basis, added what the Commission called a "sunset provision":

> Until the earlier of December 31, 1990, or the date on which an interstate pipeline accepts a gas inventory charge certificate, natural gas is eligible for transportation by interstate pipelines under this part only if [the crediting system explained in the rest of the regulation is applied].

18 C.F.R. §§ 284.8(f)(1), 284.9(f)(1) (1991). On its face, the passage appears to mean no more than that transportation provided after December 31, 1990 cannot generate credits.

Numerous parties sought rehearing of Order No. 500–H, including a group called "Indicated Producers", which sought clarification of the sunset clause. In answering the latter's request, in Order No. 500–I, the Commission stated the producers' question and its answer as follows:

> Finally, Indicated Producers ask for clarification of Order No. 500–H to make clear that from and *after the termination of crediting* under the rule, *a pipeline can no longer apply credits previously earned* to relieve it of take-or-pay obligations which are then in existence or which may thereafter accrue. The Commission clarifies that this was its intent.

FERC Stats. & Regs. ¶ 30,880 at 31,710 (emphasis added).

On April 4, 1991, FERC issued Order No. 500–K, which among other things provided that the take-or-pay crediting regulations, 18 C.F.R. §§ 284.8(f) and 284.9(f), would be deleted, and explained that Order No. 500–I meant

> not only that pipelines cannot seek credits for transportation performed after December 31, 1990, but also that they *may not after December 31, 1990 apply* against any take-or-pay liability previously unused *credits generated by transportation performed before December 31, 1990.*

FERC Stats. & Regs. ¶ 30,917 at 30,191–92 (emphasis added). This made unequivocally clear that pipelines could not apply credits after December 31, 1990 (or earlier receipt of a gas inventory charge certificate).

We note that even now the Commission appears not to have defined the meaning of "apply". Its lawyers here say that a pipeline applies a credit at the point where it "announc[es] that the volumes it had transported would be treated as purchases under a specific contract and contract year." Commission Supplemental Brief at 6. If the pipelines so specified before January 1, 1991, delay due to haggling between the parties over the amounts, or other causes, would not make the credits evaporate.

The petitioners sought clarification or rehearing of Order No. 500–K, which the Commission denied in Order No. 500–L. In so doing, it said that the time limit on application had been addressed in Order No. 500–I, that pipelines and producers were thus on notice that earned but unapplied credits could not be applied after that date, and that therefore it would not be "appropriate" for the Commission to revisit the issue. See 55 FERC at 62,695. ANR sought review in this court, contending that the Commission's refusal to allow application of credits earned but not applied before December 31, 1990 was arbitrary and capricious.

\* \* \*

■ Section 19(a) of the Natural Gas Act authorizes persons aggrieved by an order of the Commission to seek rehearing within 30 days, and further provides that no pro-

ceeding to review a Commission order may be brought by any person who has failed to apply for such rehearing. Section 19(b) allows judicial review on filing a petition within 60 days of the Commission's disposition of the application for rehearing, and adds that no objection may be considered on review unless it has been urged on the Commission in that application, unless there was "reasonable ground for failure to do so." Thus, if Orders No. 500–K and 500–L merely repeated or slightly clarified what Order No. 500–I had established, ANR's failure to seek rehearing of Order No. 500–I bars its petition here. See *RCA Global Communications, Inc. v. FCC,* 758 F.2d 722, 730 (D.C.Cir.1985) (prior order would bar review if it "disposed of the question with sufficient clarity to put [petitioner] on notice that failure to pursue its claim would bar" later review).

On its face and in hindsight it may seem plain that Order No. 500–I barred application after December 31, 1990 of credits earned before that date. ANR argues, however, that that meaning is absolutely contradictory of other statements made by the Commission, statements that Order No. 500–I made no effort to explain away; moreover, because of the character of producer-pipeline contractual relations, a December 31, 1990 time bar on applications of credits would sharply reduce the value of credits accrued during 1990. Accordingly, ANR says, a reader could not be expected to detect so bizarre a meaning.

Indeed, Order No. 500–H stated that the crediting provisions did

> *not require pipelines to inform producers before gas is transported which contract* the pipeline intends to apply the credits against. Rather, *the pipeline can wait until the end of the contract year* under the contract against which it intends to apply the credits *before informing the producer* that it is applying the credits against the pipeline's take-or-pay obligations under that contract.

FERC Stats. & Regs. at 31,527. The disputed passage of Order No. 500–I, as now understood, radically qualifies the latitude offered by this portion of Order No. 500–H.

For contracts ending December 31, 1990, or straddling that date, a pipeline must have given notice *before* the end of the contract year—not after, as Order No. 500–H says it may.

Further, a pipeline will not know for sure before the end of a contract year just how large a take-or-pay claim the producer may make, if any; the take-or-pay obligation is typically a fraction of the "deliverable" gas, a quantity that may be uncertain and as to which the producer—but not the pipeline—has detailed information at first-hand. If a pipeline is required to specify the contract before the end of the contract year (contrary to the preamble in Order No. 500–H), it may waste credits on contracts for which they are not needed.

Nonetheless, the absolutist meaning of Order No. 500–I was—even before Order No. 500–K's removal of doubt—far from unthinkable. Although Order No. 500–H said that as a general matter pipelines could wait until the end of the contract year, it also used language suggesting a complete end of the crediting process by the terminal date, saying that "crediting will cease" on December 31, 1990, see FERC Stats. & Regs. ¶ 30,867 at 31,507, and that "the final rule provides for the elimination of the crediting provisions by ... December 31, 1990." *Id.* at 31,528–29. Furthermore, in its discussion of whether to continue crediting at all, the Commission had identified producer uncertainty about credit application as one of the drawbacks of crediting. Even though producers could generally assume that pipelines would apply their credits to the highest-priced contracts, that assumption "can still leave the producer somewhat uncertain about the revenue it will receive under its various contracts," thereby making planning difficult. *Id.* at 31,527. Finally, although the requirement of early notification during 1990 doubtless impeded pipeline ability to maximize the value of credits accrued in 1990, we think that ANR exaggerates the dilemma. In the special context of "must take" gas, the Commission required pipelines to release the gas and to give 30 days advance notice (extended to 60 days in Order No. 500–I), "of its intent to apply cred-

its against a must-take obligation." [1] *Id.* at 31,532; see also 18 CFR § 184.8(f)(4)(ii)(c) (1991). ("Must take" gas is typically casinghead gas, which the producer must be able to ship promptly, for otherwise it will not be able to produce the oil from the same well. See FERC Stats. & Regs. at 31,529–30.) For must-take obligations, then, it appears that pipelines were expected to specify the contract before knowing the scope of producer claims.

Given the expressed Commission concern over producer uncertainty, and indications that notice within the contract year is by no means utterly infeasible, we think an informed reader of Order No. 500–I should have regarded its literal meaning as very possibly the one intended.

ANR has offered an alternative reading of the key passage of Order No. 500–I, but we think it implausible. Recall that that passage read:

> Finally, Indicated Producers ask for clarification of Order No. 500–H to make clear that from and after the termination of crediting under the rule, a pipeline can no longer apply credits previously earned to relieve it of take-or-pay obligations which are then in existence or which may thereafter accrue. The Commission clarifies that this was its intent.

ANR suggests a reading that elides obligations "in existence" "from and after" the termination date with ones "which may thereafter accrue". Obligations accruing "thereafter" would be in existence thereafter, so that the passage would bar use of credits *only* against take-or-pay obligations accruing after the termination date. ANR Reply Brief at 14. The reading is extremely implausible, as it disregards the "then" that modifies "in existence." Even if ANR's proposed reading is not utterly impossible, a far more straightforward interpretation is that the whole clause—"obligations which are in existence or which may thereafter accrue"—was simply intended to cover the waterfront, i.e., to

mean that credits could not be applied after December 31, 1990 to *any* take-or-pay obligations.

We note also that there is a conceivable interpretation of the paragraph under which it means nothing at all. The phrase "termination date" is never specified, so one might read the passage as saying only that the credits cannot be applied after the termination date, the latter meaning the date after which they can no longer be applied. But because the Commission clearly thought it was answering the producers' question, and because December 31, 1990 (or the pipeline's receiving a gas inventory charge certificate) was a highly probable meaning of "termination date", a reader would have to have discounted this alternative reading very heavily.

Still, we agree with ANR that in light of the contradictory remarks in Order No. 500–H, and the Commission's total failure to reconcile the "apply" passage with those remarks, one might treat Order No. 500–I as retaining some ambiguity as to whether the Commission really meant it literally. And a number of cases excuse failure to seek timely rehearing or review on the ground that ambiguity in the earlier order failed to alert the petitioner to his "aggrieved" status. See *Raton Gas Transmission Co. v. FERC*, 852 F.2d 612, 615 (D.C.Cir.1988); *Kentucky Utilities Co. v. FERC*, 789 F.2d 1210, 1215 (6th Cir.1986). In what might be viewed as a contradiction of these cases, the Supreme Court has said, "We are not prepared to acknowledge an exception to [the requirement that the aggrieved party petition for reconsideration from the original order] where an order is ambiguous, so that a party *might* think that its interests are not infringed." *ICC v. Brotherhood of Locomotive Engineers*, 482 U.S. 270, 286, 107 S.Ct. 2360, 2369, 96 L.Ed.2d 222 (1987).

We think *Brotherhood of Locomotive Engineers* may be reconciled with the other cases by considering the different meanings of ambiguity, itself a word with more

---

**1.** We read this sentence to mean that the pipeline must notify the producer that it will be applying credits (and thus not taking the gas it otherwise would have been required to take) 30 days before the pipeline's obligation to take the gas was to ripen, in order to give the producer adequate time to find an alternative purchaser.

than one meaning. On the one hand, an ambiguous order is one susceptible to more than one plausible interpretation. In this sense, Order No. 500–H is surely ambiguous, and Order No. 500–I may be. On the other hand, one might regard an order as ambiguous for these purposes only if petitioners could reasonably have understood it to mean *only* what they thought it meant. Thus in *Sam Rayburn Dam Electric Cooperative v. FPC*, 515 F.2d 998 (D.C.Cir. 1975), a much cited case on the problem, the court said that the petitioner "had no apparent reason" to infer that the Commission could have assigned the idea of "contract" the meaning necessary to vindicate its later purported clarification. *Id.* at 1007.

The language and context of Order No. 500–I suggest to us that a reader schooled in gas pipeline regulation would have perceived a very substantial risk that it meant what it later proved to mean. We find modest confirmation of this in the action of Natural Gas Pipeline Company of America, which asked FERC to clarify that, despite Order No. 500–I, "credits, once earned, are always available to mitigate ... take or pay claims by producers for periods prior to the credit termination date"; i.e., that credits *earned* before December 31, 1990 (or earlier termination) would not be "void" even if the pipeline had "not actually applied the credits" before then. Commission Brief, Appendix C, p. 2. The Commission denied Natural's rehearing request without comment or opinion. The request suggests at least that Order No. 500–I put other pipelines in mind of the peril that in fact lay before them. While ANR received a copy of this application, we do not treat that as notice in itself, as a firm cannot be charged with keeping up with every other firm's reactions to agency activity, especially in light of the masses of paper generated by regulation. Cf. *American Federation of Labor v. Donovan*, 757 F.2d 330, 339–40 (D.C.Cir.1985) (analyzing whether agency had given adequate notice of proposed rulemaking as required by statute and holding that because the agency by law had the duty to provide notice, the court could not "properly attribute notice to the other ap-

pellants on the basis of an assumption that they would have monitored the submission of comments").

Of course a party need not approach every Commission order with paranoia, petitioning for rehearing on account of any conceivable adverse meaning. But ANR's mere uncertainty as to which potential interpretation of Order No. 500–I was the correct one, even if justifiable, does not excuse its failure to ask for rehearing or clarification of that order when it issued.

■ In addition to its argument that Order No. 500–I was ambiguous, ANR presents the related but distinct argument that the relevant passage was so completely "buried" in a huge order dealing primarily with other issues that it could not effectively put ANR on notice. The passage is contained in one paragraph on the eleventh page of an order occupying twenty-nine pages in the Federal Register, see 55 Fed. Reg. 6605, 6615, and on the nineteenth of fifty pages in the FERC reporter, see FERC Stats. & Regs. ¶ 30,880 at 31,710. Insofar as ANR argues that the Commission could communicate its decrees more clearly by using suitable captions, we (also users of the Commission's product) wholeheartedly agree. But there were some signposts. The section containing the paragraph is titled "Crediting." 55 Fed.Reg. at 6609. Although this section is six pages long in the Federal Register, the paragraph was the last one (i.e., it occupied the relatively high-profile clean-up position), and its opening six words make clear that the Commission is about to respond to a request for clarification of some issue.

Thus the obscurity of the critical section was far less than that involved in ANR's primary case on point, *Mobil Exploration and Producing North America, Inc. v. FERC*, 881 F.2d 193 (5th Cir.1989). There FERC had in the course of an adjudication announced a time limit for certain applications not previously subject to any time limit. *Id.* at 195–96. It set forth the new rule in a two-sentence explanation embedded in an otherwise routine order granting the application. At least seventy-five of these applications were granted on that

same day to individual producers in an identical and routine manner without discussion. Six lawyers from Mobil reviewed "stacks" of such orders every week. *Id.* at 199. The heading of the order contained no reference to the new rule; nor did the four "ordering" paragraphs at the end of the text. The order was not published in the Federal Register. *Id.* Finally, FERC did not *apply* the new rule to the case in which it announced the rule, thus removing any incentive for the producer involved to challenge the rule and bring it to the attention of others who might be affected. *Id.* at 199–200.

Similarly, although the petitioner in *RCA Global Communications* had been a party to the adjudication claimed by the Federal Communications Commission to have disposed of the pertinent issue, there the FCC rested on "two utterly opaque footnotes in a lengthy opinion." 758 F.2d at 730. Neither footnote explicitly referred to the issue in question at all; one said merely that all matters not discussed in the text were meritless or moot (not revealing which issues were one or the other), and the other footnote was, the court said, "incomprehensible on this record". *Id.* at 731.

In contrast to these two cases, FERC's order in this case was far from "routine." The Commission was engaged in amending general rules of great importance to the industry, with a preamble duly published in the Federal Register. The heading at least revealed the general topic; the key passage was text not footnote, and it responded explicitly to a specific inquiry raised by a party on rehearing. Thus the Commission's two-sentence clarification was not sufficiently buried to justify our holding that it did not give petitioners adequate notice of its contents.

ANR's petition for review is

*Denied.*